**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF ARKANSAS**
**CENTRAL DIVISION**

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS
NOV 12 2026
TAMMY H. DOWNS, CLERK
By: DEP CLERK

UNITED STATES OF AMERICA and COMMODITY FUTURES TRADING COMMISSION,

Plaintiffs,

v.

STATE OF ARKANSAS; TIM GRIFFIN, in his official capacity as the Attorney General of Arkansas,

Defendants.

Case No. 4:26cv1255-BSM

**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

**COMPLAINT**

Plaintiffs, the United States of America and the Commodity Futures Trading Commission ("CFTC" or "Commission"), by and through their undersigned counsel, bring this civil action for injunctive and declaratory relief, and allege as follows:

## I. INTRODUCTION

1. The Commodity Exchange Act ("CEA" or the "Act"), 7 U.S.C. §1, *et seq.*, provides a comprehensive framework for the regulation of commodity derivatives transactions in the United States. This federal law gives the CFTC, a federal agency, "exclusive jurisdiction" over the regulation of commodity futures, options, and swaps traded on federally regulated exchanges. 7 U.S.C. § 2(a)(1)(A). The United States and the CFTC bring this action to halt Defendants' efforts to prohibit the operation of derivatives markets governed by federal law.

2. On November 4, 2026, the State of Arkansas, through its Attorney General Tim Griffin (collectively, "Arkansas" or "the State"), filed an enforcement action in the Circuit Court

This case assigned to District Judge Miller
and to Magistrate Judge Ervin

of Independence County, Arkansas, against Kalshi, Inc. and KalshiEX LLC (collectively, "Kalshi"). *See* Complaint, *Arkansas v. KalshiEX LLC., et al.*, No. 32CV-26-717 (Circ. Ct. (Independence Cnty.) Nov. 4, 2026). The complaint alleges that "Kalshi, in large part, is a straightforward gambling platform." *Id.* ¶ 3. Arkansas contends that "[w]hatever label [Kalshi] attach[es] to these [event] contracts, consumers use them to do what gamblers have always done: risk money on the outcome of an athletic contest in hopes of receiving a greater return," and "[t]hat is sports betting." *Id.* ¶ 7. The State seeks to "stop Kalshi's illegal gambling operations in Arkansas, recover money unlawfully obtained from Arkansas consumers, hold Kashi accountable for its deceptive and unconscionable practices, impose civil penalties, and obtain all other relief under Arkansas law." *Id.* ¶ 16.

3. The event contracts targeted by Arkansas are "swaps" under the federal CEA, and the exchanges that offer these event contracts for trading, including Kalshi, are CFTC-regulated Designated Contract Markets ("DCMs").

4. The State's efforts to prevent a CFTC-regulated DCM from offering CFTC-approved financial products intrude on the exclusive federal scheme Congress designed to oversee United States commodity derivatives markets. Prompted by the evolution of national futures markets and repeated conflicts with state law, Congress enacted the CEA, granting the CFTC "***exclusive jurisdiction***" to regulate those markets and creating a comprehensive federal regulatory framework that preempts state laws that attempt to regulate the operation of, or transactions on, CFTC-regulated exchanges. 7 U.S.C. § 2(a)(1)(A) (emphasis added). It also gave the Commission discretionary authority to approve or disapprove certain event contracts based on whether they are, in the Commission's evaluation, contrary to the public interest. *Id.* § 7a-2(c)(5)(C). This comprehensive federal regulatory scheme expressly and impliedly preempts state law as applied

to event contracts.

5. The Commission exercises its comprehensive jurisdiction over event contracts in a variety of ways. *See, e.g.*, 17 C.F.R. §§ 40.11, 40.2, 40.3. It has approved various DCMs that offer event contracts, including Kalshi. CFTC, *Order of Designation* (Nov. 3, 2020), https://www.cftc.gov/filings/documents/2020/orgkexkalshidesignation201103.pdf. It monitors the thousands of event contracts that DCMs self-certify with the CFTC, and where an event contract does not satisfy the definition of "swap" or otherwise violates the CEA, it orders that contract be taken down. 17 C.F.R. § 40.2. It brings enforcement actions against event-contract market participants who violate the CEA or Commission regulations, including by engaging in insider trading. *See, e.g.*, *United States v. Van Dyke*, No. 1:26-cr-156 (S.D.N.Y.); *United States v. Spagnuolo*, No. 1:26-mj-02020 (S.D.N.Y.). It has signed Memoranda of Understanding with professional sports leagues to permit information sharing to ensure market integrity in sports-related event contracts.[1] It has exercised its express statutory authority to further define "swap" to ensure that state-regulated gambling is not deemed a swap. 91 Fed. Reg. 65,969 (Oct. 19, 2026). And it has solicited comments for other potential rulemakings around event contracts. 91 Fed. Reg. 66,022 (Oct. 19, 2026). The Commission is thus fully engaged with the trading of event contracts, as well as the markets that offer them.

6. Arkansas is not the first State that has attempted to invade the Commission's exclusive jurisdiction over swaps. Already, several federal courts—including the Third Circuit—have swiftly responded by issuing or affirming temporary restraining orders and preliminary

[1] CFTC, Release No. 9314-26, *CFTC and National Basketball Association Sign MOU to Protect Integrity in Professional Basketball* (Oct. 26, 2026), https://www.cftc.gov/PressRoom/PressReleases/9314-26; CFTC, Release No. 9199-26, *CFTC and MLB Sign Groundbreaking MOU* (Mar. 19, 2026), https://www.cftc.gov/PressRoom/PressReleases/9199-26; CFTC, Release No. 9235-26, *CFTC and National Hockey League Sign MOU Related to Integrity in Professional Hockey* (May 21, 2026), https://www.cftc.gov/PressRoom/PressReleases/9235-26.

injunctions barring the States from enforcing their gambling laws against CFTC-regulated exchanges that offer sports-related or other event contracts. *See, e.g.*, *KalshiEX, LLC v. Flaherty*, 172 F.4th 220 (3d Cir. 2026); *Coinbase Financial Mkts. v. Raoul*, No. 25-cv-15406, 2026 WL 2969682, at *1 (N.D. Ill. Oct. 2, 2026); *United States v. Minnesota*, No. 26-cv-2661, 2026 WL 2150211 (D. Minn. July 27, 2026).

7. The United States and the Commission are injured by Arkansas's enforcement efforts. The federal government has a statutorily protected interest in maintaining exclusive jurisdiction over transactions involving swaps on DCMs, as well as in administering the CEA's comprehensive regulatory structure. Arkansas, however, is attempting to block the operation of exchanges that the Commission has expressly approved, as well as event contracts that have been self-certified to the Commission and that the Commission has permitted to be listed. These consequences directly harm the federal government's sovereign, legally protected interest in enforcing federal law.

8. The injury to the United States and the Commission, moreover, is irreparable and requires preliminary and permanent injunctive relief. Constitutional violations, including Supremacy Clause violations, are always irreparable. Furthermore, if Arkansas is permitted to intrude on the CFTC's jurisdiction over its transactions and markets, the harm to the United States's sovereign interests and regulatory jurisdiction could not be undone after final judgment. Preliminary injunctive relief is required to preserve the status quo during the pendency of the case.

9. The equities and public interest also strongly favor injunctive relief. The enforcement of a preempted state law is never in the public interest. Further, Arkansas's enforcement action against Kalshi threatens to wipe out the operation of CFTC-regulated exchanges within the State. And more broadly, the State's actions inject more uncertainty into

federal derivatives markets over the scope of the Commission's jurisdiction. To restore the Commission's exclusive jurisdiction, the State's pending enforcement action against Kalshi, as well as any future enforcement actions or investigations against federally regulated DCMs and related entities, must be enjoined immediately.

10. The Court should enforce the Commission's exclusive jurisdiction and issue preliminary and permanent injunctive relief holding that Arkansas law is preempted and unenforceable as applied directly to CFTC-regulated DCMs and to transactions listed, offered, or executed on those markets.

## II. JURISDICTION AND VENUE

11. This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331 (federal-question jurisdiction). This action presents a federal question under the laws and Constitution of the United States because it concerns whether the CEA, 7 U.S.C. § 1, *et seq.*, preempts Arkansas law insofar as it purports to regulate transactions covered by the CEA and entrusted to the Commission's regulatory jurisdiction. This Court also has jurisdiction under 28 U.S.C. § 1345 because the United States is a plaintiff.

12. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) because at least one Defendant resides in this District and all Defendants are residents of the State. Venue is also proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claim occurred and will occur in this District.

13. The Court has the authority to provide the relief requested under the Supremacy Clause, U.S. Const. art. VI, cl. 2, as well as 28 U.S.C. §§ 1651, 2201, and 2202, and its inherent equitable powers.

## III. PARTIES

14. Plaintiff the United States of America regulates U.S. financial markets, and it enforces federal commodity derivatives laws through its executive agency, the CFTC.

15. Plaintiff CFTC is an agency of the United States Government that administers and enforces the CEA. The CEA grants the CFTC authority to represent itself through its General Counsel. 7 U.S.C. § 2(a)(4).

16. Defendant State of Arkansas is a state of the United States.

17. Defendant Tim Griffin is sued in his official capacity as Attorney General of Arkansas, in which capacity he is authorized to defend the interests of the State in matters before the federal courts and to legally represent all state officers, boards, and commissions in all litigation where the State's interests are involved. Ark. Code Ann. § 25-16-703.

18. Non-party KalshiEX LLC is a financial services company with its principal place of business in New York. Kalshi has been approved by the Commission as a DCM pursuant to Sections 5 and 6(a) of the CEA.

## IV. FEDERAL LAW GOVERNING COMMODITY DERIVATIVES MARKETS

### A. Congress Vested the CFTC with Exclusive Regulatory Authority over U.S. Commodity Derivatives Markets

19. The Constitution empowers Congress to "regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const. art. I, § 8, cl. 3. The Constitution also vests the President of the United States with the "executive Power," U.S. Const. art. II, § 1, and authorizes the President to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3.

20. Based on its enumerated constitutional and sovereign powers to regulate interstate commerce, the United States has broad authority to regulate derivatives markets. That authority

includes the power to enforce the supremacy of federal law regulating derivatives markets.

21. The CEA is the federal statute that provides a comprehensive federal framework for the regulation of commodity derivatives transactions in the United States. *See* 7 U.S.C. § 1 *et seq.* The purpose of the CEA is to "serve the public interests … through a system of effective self-regulation of trading facilities, clearing systems, market participants and market professionals under the oversight of the Commission," as well as "to deter and prevent price manipulation or any other disruptions to market integrity; to ensure the financial integrity of all transactions subject to [the Act] and the avoidance of systemic risk; to protect all market participants from fraudulent or other abusive sales practices and misuses of customer assets; and to promote responsible innovation and fair competition among boards of trade, other markets and market participants." 7 U.S.C. § 5(b).

22. The CFTC is the federal executive agency charged with administering and enforcing the CEA. 7 U.S.C. § 2(a). Congress created the CFTC in 1974 to establish a uniform national system for regulating futures trading after concluding that the then-existing patchwork of state-by-state regulation had impaired the development and functioning of national commodity derivatives markets. *See* H.R. Rep. No. 93-975, at 51 (1974); S. Rep. No. 93-1131, at 36 (1974), *reprinted in* 1974 U.S.C.C.A.N. 5843, 5885.

23. Derivatives are financial instruments such as futures, options, or swaps that derive their value from something else, like a benchmark, a physical commodity, or—as relevant here—certain events or contingencies. In general, market participants use derivatives to hedge risks or speculate on commodity price movements.

24. Section 2(a)(1) of the CEA provides:

> ***The Commission shall have exclusive jurisdiction***, except to the extent otherwise provided in the Wall Street Transparency and Accountability Act of

> 2010 (including an amendment made by that Act) and subparagraphs (C), (D), and (I) of this paragraph and subsections (c) and (f), ***with respect to accounts, agreements*** (including any transaction which is of the character of, or is commonly known to the trade as, an "option", "privilege", "indemnity", "bid", "offer", "put", "call", "advance guaranty", or "decline guaranty"), ***and transactions involving swaps*** or contracts of sale of a commodity for future delivery (including significant price discovery contracts), ***traded or executed on a contract market designated pursuant to section 7 of this title*** or a swap execution facility pursuant to section 7b-3 of this title or any other board of trade, exchange, or market, and transactions subject to regulation by the Commission pursuant to section 23 of this title.

7 U.S.C. § 2(a)(1)(A) (emphasis added). Thus, "transactions involving swaps" traded on "designated" "contract market[s]" are subject to the Commission's "exclusive jurisdiction." *Id.*

25. Event contracts are a type of "swap" as defined by the CEA. Section 1a(47)(A) of the CEA broadly defines "swap" to include "any agreement, contract, or transaction"—

> (i) that is a put, call, cap, floor, collar, or similar option of any kind that is for the purchase or sale, or based on the value, of 1 or more interest or other rates, currencies, commodities, securities, instruments of indebtedness, indices, quantitative measures, or other financial or economic interests or property of any kind;
>
> (ii) that provides for any purchase, sale, payment, or delivery (other than a dividend on an equity security) that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence; . . .
>
> (iv) that is an agreement, contract, or transaction that is, or in the future becomes, commonly known to the trade as a swap … [or,]
>
> (vi) that is any combination or permutation of, or option on, any agreement, contract, or transaction described in any of [these clauses].

7 U.S.C. § 1a(47)(A).

26. The definition in subparagraph (ii) is particularly apt: event contracts "provide[] for … payment … that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency," and that event or contingency is "associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). That definition encompasses

sports event contracts: they provide for payment based on the "occurrence" or "nonoccurrence" of an event (*e.g.*, whether the Cowboys will beat the Eagles), or the "extent of the occurrence of an event" (*e.g.*, whether the Cowboys will beat the Eagles by more than seven points), and the consequences of those events are "associated with a potential financial, economic, or commercial consequence" (*e.g.*, ticket revenue for future Cowboys games, television viewership, payouts from sportsbooks, etc.). *See Flaherty*, 172 F.4th at 227–28. And beyond sports contracts, there "can be no doubt that an array of transactions are 'associated with' the required financial consequences [in 7 U.S.C. § 1a(47)(A)(ii)], and constitute swaps under this definition." *Minnesota*, 2026 WL 2150211, at *12.

27. Event contracts also qualify as swaps under subparagraph (i), in that they are binary options, which are "option[s] whose payoff is either a fixed amount or zero," that are based on a commodity (*i.e.*, the underlying event or contingency). CFTC, Futures Glossary, https://www.cftc.gov/LearnAndProtect/AdvisoriesAndArticles/CFTCGlossary/index.htm#B; *see also* 73 Fed. Reg. 25669, 25670 (May 7, 2008) ("A significant number of event contracts are structured as all-or-nothing binary transactions commonly described as binary options."); 77 Fed. Reg. 25320, 25321 n.6 (Apr. 27, 2012) ("[T]he swap definition … includes options …."). Specifically, a sports event is an "excluded commodity" (which, despite the name, is a commodity) because it is "an occurrence, extent of an occurrence, or contingency … that is (I) beyond the control of the parties to the relevant contract, agreement, or transaction; and (II) associated with a financial, commercial, or economic consequence." 7 U.S.C. § 1a(19)(iv).

28. Arkansas concedes that "Kalshi's event contracts are structured as binary options." Complaint, ¶ 63.

29. Event contracts also qualify as swaps under subparagraph (iv), in that they are

agreements or transactions that have become commonly known to the trade as "swaps." 7 U.S.C. § 1a(47)(A)(iv).

30. The Commission and the Securities and Exchange Commission ("SEC") have authority to "further define the term[] 'swap.'" 15 U.S.C. § 8302(d). The Commissions have issued a notice of proposed rulemaking that would further define the term "swap" to encompass event contracts based on sports-, political-, weather-, and cultural-related events. *See* 91 Fed. Reg. 66,022 (Oct. 19, 2026).

31. The Commission's exercise of jurisdiction over event contracts in no way demonstrates or implies that it has jurisdiction over casino-style gambling wagers. To the contrary, the Commission and the SEC released an Interim Final Rule pursuant to their authority to further define swap that excludes from the definition of "swap" gambling wagers offered by casinos or sportsbooks licensed under state or tribal law. *See* 91 Fed. Reg. 65,969 (Oct. 19, 2026).

32. The CEA requires that, subject to certain exemptions or exceptions, commodity derivatives transactions must be conducted on exchanges designated by, or registered with, the Commission. As relevant here, no person may operate a facility for the trading or processing of swaps unless the facility is registered as a swap execution facility or designated as a contract market. *See* 7 U.S.C. § 7b-3(a); 17 C.F.R. § 37.3.

33. Designated contract markets (DCMs) are boards of trade or exchanges that operate under the regulatory oversight of the Commission pursuant to Section 5 of the CEA, 7 U.S.C. § 7. The Commission designates a board of trade as a contract market through a formal application process through which an applicant board of trade must demonstrate its ability to comply with detailed statutory requirements called "core principles." 7 U.S.C. § 7(d). These core principles require, among other things, that DCMs:

a. "[E]stablish, monitor, and enforce compliance with the rules of the contract market, including—(i) access requirements; (ii) the terms and conditions of any contracts to be traded on the contract market; and (iii) rules prohibiting abusive trade practices on the contract market." 7 U.S.C. § 7(d)(2)(A).

b. "[H]ave the capacity to detect, investigate, and apply appropriate sanctions to any person that violates any rule of the contract market." 7 U.S.C. § 7(d)(2)(B).

c. "[L]ist on the contract market only contracts that are not readily susceptible to manipulation." 7 U.S.C. § 7(d)(3).

d. "[H]ave the capacity and responsibility to prevent manipulation, price distortion, and disruptions of the delivery or cash-settlement process through market surveillance, compliance, and enforcement practices and procedures, including—(A) methods for conducting real-time monitoring of trading; and (B) comprehensive and accurate trade reconstructions." 7 U.S.C. § 7(d)(4).

e. "[P]rovide a competitive, open, and efficient market and mechanism for executing transactions that protects the price discovery process …." 7 U.S.C. § 7(d)(9)(A).

f. "[M]aintain rules and procedures to provide for the recording and safe storage of all identifying trade information in a manner that enables the contract market to use the information—(A) to assist in the prevention of customer and market abuses; and (B) to provide evidence of any violations of the rules of the contract market." 7 U.S.C. § 7(d)(10).

g. "[E]stablish and enforce—(A) rules and procedures for ensuring the financial integrity of transactions … and (B) … (ii) the protection of customer funds." 7 U.S.C. § 7(d)(11).

h. "[E]stablish and enforce rules—(A) to protect markets and market participants from abusive practices committed by any party … and (B) to promote fair and equitable trading on the contract market." 7 U.S.C. § 7(d)(12).

34. The Commission has promulgated detailed rules governing the process through which a board of trade can achieve designation as a contract market, as well as detailed rules governing the operations of the contract market once that designation is in place. DCMs may list for trading commodity futures, options, or swaps as permitted by Part 38 of the Commission's regulations. 17 C.F.R. part 38, *et seq.*

35. Today there are 30 exchanges in the United States with active designations from the CFTC to operate as a contract market. These DCMs include providers of event contracts,

whether they be recently designated markets (*e.g.*, Kalshi), or markets with longstanding designations (*e.g.*, North American Derivatives Exchange (Nadex) and CME Group).

**B. State Attempts to Shut Down National Markets Drove Early Derivatives Regulation**

36. Arkansas's attempt to shut down derivatives trading is not new. By the mid-nineteenth century, commodity exchanges in major trading hubs like New York and Chicago had organized trading on futures contracts to facilitate price discovery (information exchange), risk management (hedging), and speculation. But States and courts impeded these new markets, often failing to distinguish between futures trading and "gambling" or "wagering," with many States even prohibiting futures trading as a form of gambling. *See, e.g.*, *Irwin v. Williar*, 110 U.S. 499, 508–09 (1884) (describing futures contracts as "nothing more than a wager"); *see also Cothran v. Ellis*, 16 N.E. 646, 647 (Ill. 1888) (describing futures as "gambling in grain").

37. Nevertheless, the Supreme Court and Congress acknowledged that futures markets served a valuable economic function and should be given room to develop. As Justice Holmes, writing for the Supreme Court, noted in *Board of Trade of Chicago v. Christie Grain & Stock Co.*, 198 U.S. 236, 247–48 (1905):

> People will endeavor to forecast the future, and to make agreements according to their prophecy. Speculation of this kind by competent men is the self-adjustment of society to the probable. Its value [is] well known as a means of avoiding or mitigating catastrophes, equalizing prices, and providing for periods of want. It is true that the success of the strong induces imitation by the weak, and that incompetent persons bring themselves to ruin by undertaking to speculate in their turn. But legislatures and courts generally have recognized that the natural evolutions of a complex society are to be touched only with a very cautious hand, and that such coarse attempts at a remedy for the waste incident to every social function as a simple prohibition and laws to stop its being are harmful and vain.

38. Congress, recognizing the value of these new markets and the negative effects of a patchwork of state regulation, centralized the oversight and regulation of futures trading on federally regulated contract markets. The first federal legislation designed to create a

comprehensive federal regulatory framework for futures markets was the Future Trading Act of 1921, Pub. L. No. 67-66, 42 Stat. 187 (1921) ("21 Act"), followed by the Grain Futures Act of 1922, Pub. L. No. 67-331, 42 Stat. 998 (1922) ("22 Act"). In passing these laws, Congress recognized the importance of uniform federal regulation of futures markets, even over objections that the new legislation would displace some States' regulations. *Cf.* H.R. Rep. No. 67-1095, at 5 (1922) (Conf. Rep.) (objecting that the bill was "designed to … more or less eliminate some of the most important police powers of several sovereign States"). Yet these early statutes did not make preemption complete, as the Supreme Court held that federal law "did not supersede any applicable provisions of [] Missouri law making gambling in grain futures illegal." *Dickson v. Uhlmann Grain Co.*, 288 U.S. 188, 198 (1933).

39. Congress expanded federal oversight of futures markets in 1936 with the Commodity Exchange Act, Pub. L. No. 74-675, 49 Stat. 1491 (1936). But even as futures markets expanded beyond their agricultural origins, market participants continued to face the persistent threat of state regulation through a patchwork of state laws. The CEA, as it then existed, permitted state involvement in futures markets to at least some extent, as Section 4c of that Act provided that "nothing in this section or section 4b of the title shall be construed to impair any State law applicable to any transaction enumerated or described in such sections." 7 U.S.C. § 6c (1940). The Supreme Court held that this language "serves the function of preventing supersedure and preserving state control in two areas where state and federal law overlap." *Rice v. Board of Trade of Chicago*, 331 U.S. 247, 255 (1947).

### C. Congress Gave the CFTC "Exclusive" Jurisdiction over Futures Trading in 1974

40. In 1973, futures exchanges recommended that "federal policy … be uniform throughout the United States" and not "subject to the vagaries" of different obligations in "different jurisdictions." Review of Commodity Exch. Act and Discussion of Possible Change: Hearings

Before the H. Comm. on Agric., 93d Cong., 1st Sess. 121 (1973). Congress quickly responded, explicitly addressing the issue the following year when it passed the Commodity Futures Trading Commission Act of 1974, Pub. L. No. 93-463, 88 Stat. 1389 (1974) ("CFTC Act of 1974").

41. With the passage of the CFTC Act of 1974, Congress amended the CEA to establish "a comprehensive regulatory structure to oversee the volatile and esoteric futures trading complex." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 356 (1982) (quoting H.R. Rep. No. 93-975, at 1 (1974)).

42. The CFTC Act of 1974 amendments to the CEA worked a sea change in the regulation of U.S. derivatives markets in three critical ways. First, Congress established the CFTC, vesting in this federal executive agency the authority to administer the CEA. Second, Congress expanded the scope of the CEA to cover all commodities. Third, Congress expressly gave the CFTC "exclusive jurisdiction" over U.S. commodity futures and options markets. *See* CFTC Act of 1974, § 201(b), 88 Stat. at 1395 (providing that "the Commission shall have exclusive jurisdiction with respect to accounts, agreements (including any transaction which is of the character of, or is commonly known to the trade as, an 'option' … ), and transactions involving contracts of sale of a commodity for future delivery, traded or executed on a contract market designated pursuant to section 5 of this Act or any other board of trade, exchange, or market" (codified at 7 U.S.C. § 2(a)(1)(A))).

43. Preemption was an express goal of the CFTC Act of 1974. Congress recognized the need for uniform, nationwide regulation of futures and options in commodity markets because concurrent regulation by the states or other federal regulators such as the Securities and Exchange Commission could lead to "total chaos." *See* Commodity Futures Trading Act of 1974: Hearings Before the S. Comm. on Agric. & Forestry on S. 2485, S. 2578, S. 2837, H.R. 13113, 93d Cong.,

2d Sess. 685 (1974) (statement of Sen. Clark). The saving clause in Section 4c, which preserved certain applications of state law from preemption, was stricken from the statute "to assure that Federal preemption is complete." 120 Cong. Rec. 30458, 30464 (Sept. 9, 1974) (statement of Sen. Curtis). Thus, the CFTC Act of 1974 "preempt[ed] the field insofar as futures regulation is concerned" such that "if any substantive State law regulating futures trading was contrary to or inconsistent with Federal law, the Federal law would govern." H.R. Rep. No. 93-1383 (1974) (Conf. Rep.), *reprinted in* 1974 U.S.C.C.A.N. 5894, 5897.

44. The CFTC Act also legislatively overturned preexisting judicial precedent holding that prior versions of the CEA were not preemptive. In *Rice v. Board of Trade of Chicago*, 331 U.S. 247 (1947), the Supreme Court held that the CEA did not preempt state law, for two reasons. First, there was no "declaration [in the CEA] by Congress that the system which it has adopted for the regulation of trading on contract markets is exclusive of state regulation." *Id.* at 253. The Court drew a contrast to a companion case decided the same day, *id.* at 248, 253, which held that the United States Warehouse Act did preempt state law by granting the Secretary of Agriculture "exclusive" "power, jurisdiction, and authority" within a particular domain, *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 224 (1947). Second, the Court pointed out that Section 4c of the CEA expressly "prevent[s] supersedure and preserv[es] state control in [] areas where state and federal law overlap." *Board of Trade*, 331 U.S. at 255.

45. Congress rectified both impediments when it created the Commission in 1974. First, Congress gave the Commission "exclusive jurisdiction" over futures trading—just like the Warehouse Act. 7 U.S.C. § 2(a)(1)(A). Second, it removed Section 4c "[i]n order to assure that Federal preemption is complete." 120 Cong. Rec. S 30458, 30464 (Sept. 9, 1974). "These amendments established independent evidence of congressional intent to displace any state

regulatory role," as "they wholly and unequivocally eliminated each of the bases the Supreme Court had relied on in *Rice v. Board of Trade* to hold that the CEA did not preempt state regulation of commodities trading." Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*, 58 Chicago-Kent L. Rev. 657, 692–93 (1982).

**D. Congress Reinforced and Clarified the CFTC's Exclusive Jurisdiction After 1974**

46. Amendments to the CEA between 1978 and 2010 repeatedly reinforced and clarified the Commission's exclusive jurisdiction over futures and options.

47. In the Futures Trading Act of 1978 ("'78 Act"), Congress preserved the Commission's exclusive authority over futures transactions on CFTC-regulated DCMs while clarifying the States' ability to pursue certain CEA violations against actors other than federally regulated exchanges. The '78 Act added a section to the CEA authorizing states to bring actions for injunctive or monetary relief for specified violations of the CEA and to enforce their "general civil or criminal antifraud" statutes. *See* '78 Act, Pub. L. No. 95-405, § 15(7), 92 Stat. 865, 873 (1978) (codified at 7 U.S.C. § 13a-2(7)). Other than this explicit authorization of state authority, the CEA retained the broad preemption of state laws put in place in 1974. Proposals to carve off pieces of the Commission's "exclusive" jurisdiction were rejected, because "[t]he nature of the underlying commodity is not an adequate basis to divide regulatory authority." S. Rep. No. 95-850, at 111–12 (1978), *reprinted in* 1978 U.S.C.C.A.N. 2087, 2110–11. That "a futures contract market does not fit into the traditional mold where there are both hedging and price-discovery functions should not be the determining factor in whether the contract is to be regulated by the CFTC." *Id.* Congress also further added to the list of justifications supporting the Commission's exclusive jurisdiction over commodity derivatives, citing concerns over "costly duplication and possible conflict of regulation or over-regulation." *Id.*

48. The Futures Trading Act of 1982 ("'82 Act") further clarified the scope of the

CEA's preemption of other federal and state laws and the role of the States in pursuing illegal or fraudulent off-exchange transactions, while still recognizing "the CFTC['s] exclusive jurisdiction to regulate futures trading and enforce the provisions of the Act, thereby preempting any State regulatory laws." H.R. Rep. No. 97-565, at 44–45 & 102–03 (1982), *reprinted in* 1982 U.S.C.C.A.N. 3871, 3893–94 & 3951–52. First, the '82 Act clarified the procedures for States to pursue violations of the CEA's anti-fraud provisions in state court. Second, the '82 Act added language to permit the application of federal or state laws to *off-exchange* transactions or unregistered market participants. '82 Act, Pub. L. No. 97-444, § 229, 96 Stat. 2294, 2318 (1982). Other state laws that could arguably apply to DCMs and market participants registered with the CFTC remained preempted. *See* H.R. Rep. No. 97-565, at 44–45 & 102–103, 1982 U.S.C.C.A.N. at 3893–94, 3951–52. Congress explained that it "continue[d] to support the idea of a single unified program of regulation and exclusive CFTC jurisdiction over exchange-traded futures," "recogniz[ing] the somewhat esoteric nature of the commodity futures markets and the desire to have knowledgeable and uniform enforcement of the Act." *Id.*

49. In the Futures Trading Practices Act of 1992 ("'92 Act"), Pub. L. No. 102-546, 106 Stat. 3590 (1992), Congress gave the Commission authority to "exempt" certain off-exchange ("over-the-counter" or "OTC") derivatives transactions from the CEA's mandatory exchange-trading regime. *Id.* § 502(a), 106 Stat. 3629–31. Yet in the same section of the '92 Act, Congress expressly preempted the application of state or local gambling or bucket shop laws as applied to certain off-exchange derivative transactions exempted by the Commission. *Id.* § 502(c), 106 Stat. 3631; *see also* Commodity Futures Modernization Act of 2000, Pub. L. No. 106-554, Appendix E, § 117, 114 Stat. 2763A-365, 2763A-402–03 (2000). *A fortiori*, state laws are necessarily preempted as to derivatives that are traded *on a CFTC-registered exchange* and fall within the

Commission's "exclusive jurisdiction." 7 U.S.C. § 2(a)(1)(A).

50. Congress has long understood that CFTC-regulated derivatives can be mistaken by some as gambling. State gambling laws, after all, prompted Congress to enter the field of derivatives regulation in the first place. More recently, Congress enacted the Unlawful Internet Gambling Enforcement Act of 2006, which prohibits an online "bet or wager" that is "unlawful under any applicable Federal or State law in the State or Tribal lands in which the bet or wager is initiated, received, or otherwise made." 31 U.S.C. § 5362(10). Significantly, Congress expressly excluded from the definition of "bet or wager" "any transaction conducted on or subject to the rules of a registered entity or exempt board of trade under the Commodity Exchange Act." *Id.* § 5362(1)(E)(ii). For Congress, then, CEA-regulated transactions are not gambling.

**E. Congress Embraced Preemption for Swap Transactions in the Dodd-Frank Act**

51. In the wake of the 2008 financial crisis, Congress reworked the regulatory structure for the "swaps" market, creating a framework within the CEA for the on-exchange execution, clearing, and reporting of vast portions of those swaps. The 2010 Dodd-Frank Act expressly extended the Commission's "exclusive jurisdiction" to encompass "accounts, agreements …, and transactions involving swaps" traded on DCMs and swap execution facilities. *See* Pub. L. No. 111-203, 124 Stat. 1376 (2010); 7 U.S.C. § 2(a)(1)(A).

52. In the Dodd-Frank Act, Congress made clear that the Commission has exclusive jurisdiction over event contracts. In CEA § 5c(c)(5)(C) (codified at 7 U.S.C. § 7a-2(c)(5)(C)), Congress created a "Special Rule" that provides the Commission with specific oversight and prohibitory authority over event contracts that "involve" "activity that is unlawful under any Federal or State law," "terrorism," "assassination," "war," "gaming," or "other similar activity determined by the Commission, by rule or regulation, to be contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C)(i). The Special Rule states that the Commission "may determine" that event

contracts involving these activities "are contrary to the public interest" and may not be listed on CFTC-regulated markets, including contracts whose underlying activity involves "gaming." *Id.* § 7a-2(c)(5)(C)(i)–(ii).

53. By creating a specific public-interest review process, Congress signaled that these contracts fall within the Commission's exclusive regulatory purview, not the States'.

**F. The Commission Uses Its Authority to Carry Out Congress's Directives**

54. The CEA confers on the Commission the authority to make rules governing swaps and other derivatives contracts. See, *e.g.*, 7 U.S.C. §§ 2, 6, 6s, 7. Pursuant to that authority, the Commission has for decades promulgated rules that regulate large, nationwide markets and which seek to provide clarity to the industry, market participants, and the public. *See* 17 C.F.R. § 1.1, *et seq*.

55. The Commission's responsibilities include issuing guidance and promulgating new rules to provide certainty when markets change and innovate. The CFTC already has extensive rules on what a board of trade must do to become a DCM, *see* 17 C.F.R. Part 38, and what a DCM must do to either self-certify a contract before listing, *see* 17 C.F.R. § 40.2, or to submit a contract for the Commission to approve, *see* 17 C.F.R. § 40.3.

56. The CEA's layered oversight approach also requires DCMs to serve as the first line of defense in policing their markets. Before listing an event contract for trade, a DCM must provide the Commission with information including the contract's rules, "a concise explanation and analysis" of the contract's "terms and conditions," and "a certification … that the product to be listed complies with the [CEA] and [CFTC] regulations." 17 C.F.R. § 40.2(a)(3). The Commission can require DCMs to turn over "evidence, information or data" proving compliance with the CEA. *Id.* § 40.2(b). If a DCM offers a "false certification," the Commission "may stay the listing of a contract." *Id.* § 40.2(c). Indeed, the Commission recently exercised that authority, staying two

contracts to evaluate those contracts' compliance with the CEA and CFTC regulations. *See*, *e.g.*, Order to Withdraw Certification Under Commission regulation 40.2(d) and Instituting Proceedings and Staying the Listing of the Contract Under Commission Regulation 40.2(c) (Oct. 22, 2026), *available at* http://cftc.gov/IndustryOversight/IndustryFilings/TradingOrganizationProducts/65134; Order Instituting Proceedings and Staying the Listing of the Contract Under Commission Regulation 40.2(c) (Oct. 21, 2026), *available at* https://www.cftc.gov/IndustryOversight/IndustryFilings/TradingOrganizationProducts/65256.

57. With respect to event contracts, the Commission has published advisory letters to DCMs on prediction markets and event contracts. For example, in September 2026, the Commission issued an advisory cautioning that "mention market" contracts—*i.e.*, event contracts based on whether an individual will say or mention certain words—present a heightened risk of manipulation and therefore may violate the CEA. CFTC, Release No. 9302-26, *CFTC Releases Staff Advisory on Mention Markets* (Sept. 22, 2026), https://www.cftc.gov/PressRoom/PressReleases/9302-26; *see also* CFTC Staff Letter No. 26-08, Prediction Markets Advisory, (Mar. 12, 2026).

58. The Special Rule gives the Commission authority to prohibit certain event contracts that it deems contrary to the public interest. 7 U.S.C. § 7a-2(c)(5)(C). Pursuant to that authority, the CFTC has proposed rules that would guide public-interest determinations for event contracts that involve the enumerated categories of activity, including event contracts that involve sports. 91 Fed. Reg. 35,806 (June 12, 2026).

59. To provide additional clarity in the marketplace, the Commission issued an Interim Final Rule ("IFR") pursuant to its authority to further define a swap, *see* 15 U.S.C. § 8302(d), that "affirms and codifies the Commission's longstanding position that casino-style gambling products,

including sports-wagering contracts entered into on a sportsbook and casino games, are not swaps and do not fall within the CFTC's jurisdiction." 91 Fed. Reg. 65,969, 65,971 (Oct. 19, 2026). The IFR, which has the force of law, aligns with the CFTC's longstanding position that instruments historically regulated by states, such as insurance, are not "swaps," even though such instruments and swaps can achieve similar functions. *Id.* at 65,972. The IFR acknowledges that gambling wagers and event contracts may offer "similar economic exposure," but nonetheless emphasizes they are "structurally different products subject to distinct regulatory regimes." *Id.* at 65,975.

60. The IFR also reflects the longstanding view of market participants that sports event contracts are CFTC-regulated derivatives, not state-regulated sports bets. In 2021, gaming industry companies Seneca Resorts & Casinos, Fifth Street Gaming, and GameCo commented that NFL event contracts would "serve an important economic purpose for our industry by allowing regulated sportsbooks to better manage economic risk," and stressed that the "contracts are not bets or wagers by any measure; rather they will allow our industry access to the same kinds of valuable hedging tools that are used by many other industries."[2]

61. The CFTC also promulgated a notice of proposed rulemaking ("NPRM") proposing to exercise the Commission's shared authority pursuant to 15 U.S.C. § 8302(d)(1) to further define "swap" to "expressly clarify that event contracts, including those based on sports-, politics-, cultural-, and weather-related events, are swaps" under the CEA. 91 Fed. Reg. 66,022, 66,025 (Oct. 19, 2026). The Commission believes that event contracts are "commonly known to the trade as swaps" because of "the actual practice of market participants [of treating event contracts as

[2] Letter from Jason Crane to Christopher Kirkpatrick (Jan. 13, 2021), *available at* https://comments.cftc.gov/PublicComments/ViewComment.aspx?id=63793; Letter from Seth Schorr to Christopher Kirkpatrick (Jan. 4, 2021), *available at* https://comments.cftc.gov/Public Comments/ViewComment.aspx?id=63782 (same); Letter from Blaine Graboyes Goldman to Christopher Kirkpatrick (Jan. 5, 2021), *available at* https://comments.cftc.gov/PublicComments /ViewComment.aspx?id=63784 (same).

swaps] and the longstanding regulatory treatment of [event contracts as swaps] by the CFTC." 91 Fed. Reg. at 66,026.

62. As the NPRM explains, the Commission has been steadfast for decades in recognizing that event contracts are derivatives subject to its jurisdiction. In 1993, it allowed Iowa Electronic Markets to list event contracts based on U.S. and Canadian elections. *Id.* (citing CFTC Staff Letter No. 93-66 (June 18, 1993)). In 2008, the Commission issued a concept release acknowledging its regulatory jurisdiction over event contracts. *Id.* (citing 73 Fed. Reg. 25,669, 25,670–73 (May 7, 2008)). Two years later, it allowed the listing of event contracts on box-office receipts. *Id.* (citing Statement of the Commission approving certain MDEX contracts (June 14, 2010) at 1).

63. The NPRM also explains how exchanges and their affiliates have overwhelmingly and uniformly treated event contracts—including sports, politics, weather, and culture event contracts—as swaps by complying with the Commission's swap regulatory regime. DCMs have self-certified thousands of these event contracts over the past several years. *Id.* (citing CFTC, Designated Contract Market Products, *available at* https://www.cftc.gov/IndustryOversight/IndustryFilings/TradingOrganizationProducts). These include both new entrants into the market and longstanding exchanges like CME Group, which has recognized in comments to the CFTC that "event contracts and swaps are not new and have been subject to the existing regulatory scheme for years without issue." *Id.* (citing Letter from Jonathan Marcus to Christopher Kirkpatrick (Apr. 30, 2026) at 2, *available at* https://comments.cftc.gov/PublicComments/ViewComment.aspx?id=115538). Cboe Global Markets has similarly stated in comments that event contracts "generally fall within the CEA's broad definition of 'swap.'" *Id.* (citing Letter from Patrick Sexton to Christopher Kirkpatrick (May 5, 2026) at 3, *available at* https://comments.cftc.

gov/PublicComments/ViewComment.aspx?id=115665).

64. Other market participants have also consistently treated event contracts as swaps subject to the Commission's jurisdiction. For years, institutional traders have acted as market makers on prediction markets, providing liquidity and earning revenue on the bid-ask spread from peer-to-peer trading volume—unlike sportsbooks, which extract a "vig" from the fixed odds it offers to bettors. Market makers support price discovery based on shifting supply and demand that is visible on a public orderbook. *Id.* (citing, e.g., *Citadel Securities Looks at Prediction Markets as Trading Scales*, Bloomberg (Apr. 16, 2026)). And a wide array of businesses and individuals have used event contracts to hedge various risks, including those related to sports, weather, and pending legislation. *Id.* (citing, e.g., *Prediction Markets Take a Swing at Hedging for US Small Business*, Reuters (Aug. 28, 2026)).

65. The Commission pursues enforcement actions against market participants who violate the CEA or CFTC regulations in trading event contracts. For example, the Commission recently filed a civil enforcement action against a U.S. servicemember who used sensitive nonpublic information to trade event contracts related to the ouster of Venezuelan President Nicolás Maduro. *See CFTC v. Van Dyke*, No. 1:26-cv-3369 (S.D.N.Y. Apr. 23, 2026). The Commission also has filed an enforcement action against a Google employee who used nonpublic information to trade event contracts related to Google's Year in Search list. *See CFTC v. Spagnuolo*, No. 1:26-cv-4419 (S.D.N.Y. May 27, 2026). Likewise, the Justice Department is bringing commodity-fraud criminal charges for insider trading of event contracts, which presupposes CEA coverage. *See United States v. Van Dyke*, No. 1:26-cr-156 (S.D.N.Y.); *United States v. Spagnuolo*, No. 1:26-mj-02020 (S.D.N.Y.). In addition, the Commission has penalized persons who offer event contracts without registering as a DCM. For example, the Commission

fined Polymarket.com and ordered it to wind down its U.S. operations for offering "swaps as defined by Section 1a(47) of the [CEA]" without CFTC registration. *See* CFTC, *In re: Blockratize, Inc.*, CFTC Docket No. 22-09 (Jan. 3, 2022); *see also* CFTC *In re: George Anthony Devolder Santos*, CFTC Docket No. 26-05 (July 31, 2026) (imposing penalties on former Congressman George Santos for manipulative activity around State of the Union event contracts); CFTC, *In re: Gabriel Perez*, CFTC Docket No. 26-06 (Aug. 28, 2026) (imposing penalties on teleprompter operator who used nonpublic information to trade event contracts related to President Trump's speeches).

66. The Commission has executed Memoranda of Understanding with the National Basketball Association, Major League Baseball, and the National Hockey League that provide a mechanism for each league to exchange information with the Commission, which will allow the Commission to swiftly respond to incidents on prediction markets and anticipate emerging trends.[3]

67. And the Commission continues to engage in rulemaking. A proposed rule entitled "Regulation Customer Protection and Identification" is currently under review by the Office of Information and Regulatory Affairs.[4]

68. Where other States have sued to enforce gambling or other criminal laws, the Commission has not stood idly by. To date, it has brought preemption actions against Arizona,

---

[3] CFTC, Release No. 9314-26, *CFTC and National Basketball Association Sign MOU to Protect Integrity in Professional Basketball* (Oct. 26, 2026), https://www.cftc.gov/PressRoom/PressReleases/9314-26; CFTC, Release No. 9199-26, *CFTC and MLB Sign Groundbreaking MOU* (Mar. 19, 2026), https://www.cftc.gov/PressRoom/PressReleases/9199-26; CFTC, Release No. 9235-26, *CFTC and National Hockey League Sign MOU Related to Integrity in Professional Hockey* (May 21, 2026), https://www.cftc.gov/PressRoom/PressReleases/9235-26.

[4] *See* RIN 3038-AF84, https://www.reginfo.gov/public/do/eoDetails?rrid=1586013.

Connecticut, Illinois, Kentucky, Minnesota, New Mexico, New York, Rhode Island, Wisconsin, and Utah. *See United States v. Arizona*, No. 2:26-cv-02246 (D. Ariz. Apr. 2, 2026); *United States v. Connecticut*, No. 3:26-cv-00498 (D. Conn. Apr. 2, 2026); *United States v. Illinois*, No. 1:26-cv-03659 (N.D. Ill. Apr. 2, 2026); *United States v. Kentucky*, No. 3:26-cv-00049-SCM (E.D. Ky. June 23, 2026); *United States v. Minnesota*, No. 0:26-cv-2661 (D. Minn. May 19, 2026); *United States v. New Mexico*, No. 1:26-cv-01912 (D. N.M. June 12, 2026); *United States v. New York*, No. 1:26-cv-3404 (S.D.N.Y. Apr. 24, 2026); *KalshiEX LLC v. Furcolo,* No. 1:26-cv-00327 (D. R.I. May 21, 2026); *United States v. Wisconsin*, No. 2:26-cv-749 (E.D. Wis. Apr. 28, 2026), *appeal filed* No. 26-2636 (7th Cir.); *United States v. Utah*, No. 2:26-cv-01055 (D. Utah Oct. 26, 2026). Preliminary injunctions have been entered in favor of the federal government against state enforcement of preempted gambling laws against CFTC-registered entities in Arizona, Illinois, and Minnesota. *See KalshiEX LLC v. Johnson*, 832 F. Supp. 3d 954 (D. Ariz. 2026); *Raoul*, 2026 WL 2969682, at *1; *Minnesota*, 2026 WL 2150211, at *1.

## V. ARKANSAS IS TARGETING SWAPS THAT TRADE ON CFTC-REGISTERED DESIGNATED CONTRACT MARKETS

69. On November 4, 2026, the State of Arkansas filed a complaint for declaratory judgment, permanent injunction, restitution, damages, civil penalties, unpaid taxes, attorneys' fees, costs, and pre-and post-judgment interest against Kalshi in the Circuit Court of Independence County, Arkansas. *See* Complaint, *Arkansas v. KalshiEX LLC., et al.*, No. 32CV-26-717 (Circ. Ct. (Independence Cnty.) Nov. 4, 2026). The complaint alleges that Kalshi's event contracts constitute illegal gambling, and Kalshi has been deceptively conveying the impression to Arkansas consumers that its products are legal. *Id.* ¶ 178. Arkansas brings Arkansas Deceptive Trade Practices Act ("ADTPA") claims and a common law unjust enrichment claim. *Id.* ¶ 162–211. Specifically, Arkansas's complaint alleges:

a. "Upon information and belief, Kalshi has been operating in the State of Arkansas for years, but has never paid sales or use taxes." *Id.* ¶ 68.

b. "Upon information and belief, thousands of Arkansas residents have created accounts and conducted transactions on the Kalshi platform, including individuals between the ages of 18 and 20." *Id.*

c. "Kalshi has violated the ADTPA … [t]hrough the promotion of wagering on its websites and mobile apps …, its advertising, including on social media and on mobile application stores …, [and] [t]hrough statements on its website and mobile apps. *Id.* ¶¶ 176–179.

d. "Kalshi's misrepresentations and false statements had the capacity, tendency, and effect of deceiving and misleading consumers concerning both the legality of Kalshi's products and the nature, safety, integrity, and risks of those products." *Id.* ¶ 180.

e. "Kalshi has engaged in unconscionable practices through its unauthorized offering and facilitation of wagering in Arkansas." *Id.* ¶ 188.

f. "Kalshi's unconscionable practices have exposed consumers, including persons aged 18 through 20 who cannot lawfully engage in casino gaming in Arkansas, to monetary losses in disregard of Arkansas's wagering safeguards." *Id.* ¶ 190.

g. "Kalshi deceptively omitted and concealed the material fact that wagers offered on its website are illegal in Arkansas" and "the risks associated with insider trading, manipulation, trading based on advance knowledge of contract outcomes, and the extent to which consumers may be trading against sophisticated participants possessing significant informational, technological, financial, or other

advantages." *Id.* ¶ 198.

h. "Kalshi's omissions had the capacity, tendency, and effect of deceiving and misleading consumers concerning both the legality of Kalshi's platform and the nature, safety, integrity, and risks of wagering on its platform." *Id.* ¶ 199.

i. "Kalshi has received and retained transaction fees and other revenues from Arkansas consumers through … unlawful wagering practices" and "[i]t would be unjust and inequitable for Kalshi to retain those benefits because Kalshi would not have received those benefits absent its violations of Arkansas law." *Id.* ¶ 205, 209.

70. Arkansas seeks "an injunction to prevent Kalshi's continued violation of the ADTPA." *Id.* ¶¶ 181, 192, 200.

71. Arkansas also seeks civil penalties under the ADTPA, which permits the circuit court to award civil penalties of up to $10,000 per violation. Ark. Code Ann. § 4-88-113(a)(3).

72. On most contracts, Kalshi earns between $0.07 and $2.63 in transaction fees per 100 contracts it facilitates. *See* Kalshi, Fee schedule, https://kalshi.com/fee-schedule (last visited Nov. 10, 2026).

73. If Arkansas seeks civil penalties on a per-violation basis, the penalties would dwarf Kalshi's income from its activities in Arkansas and could reach the hundreds of millions of dollars.

74. Arkansas's attempt to shut down the operations of CFTC-regulated entities gravely interferes with the Commission's exclusive jurisdiction over swaps. The purpose of the CEA is to create a uniform and predictable nationwide market for commodity derivatives trading, and the Commission oversees that market by approving and monitoring DCMs, and by mandating compliance with self-certification or submission-certification requirements before a DCM can list event contracts. The State's enforcement efforts undermine that uniformity, thwart Congress's

federal framework for commodity derivatives markets, and intrude on the Commission's exclusive jurisdiction. Arkansas's enforcement action also makes it much more difficult for the Commission to regulate, advise, and enforce its authority over DCMs, wasting resources and subverting the Commission's congressionally mandated authority.

75. Every step Arkansas takes toward enforcing preempted state law against the Commission's regulated entities causes additional disruption to the markets exclusively regulated by the Commission and thus causes irreparable harm to the Commission's exclusive jurisdiction, authority, and operations. Incremental enforcement steps send mixed signals to this interconnected market, disrupting their operations. DCMs and DCOs are forced to guess whether they are held to the standards of the CFTC and CEA, state regulators, or both. This frustrates the purpose of the CEA to serve the public interest via a system of effective self-regulation of trading facilities, clearing systems, market participants, and market professionals under the Commission's oversight.

## VI. ARKANSAS LAW IS PREEMPTED AS APPLIED TO SWAPS OFFERED BY DESIGNATED CONTRACT MARKETS

76. The Constitution's Supremacy Clause mandates that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof … shall be the supreme Law of the Land … any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2.

77. The CEA, as continuously refined over more than a century, gives the CFTC "exclusive jurisdiction" over futures and swaps traded on a DCM. 7 U.S.C. § 2(a)(1)(A). The CEA "preempts the application of state law." *Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980). "[P]reemption is appropriate '[w]hen application of state law would directly affect trading on or the operation of a futures market.'" *Effex Cap., LLC v. National Futures Ass'n*, 933 F.3d 882, 894 (7th Cir. 2019) (quoting *American Agric. Movement v. Board of Trade of Chi.*, 977 F.2d 1147,

1156–57 (7th Cir. 1992)).

78. "[U]nder the Supremacy Clause, from which our pre-emption doctrine is derived, any state law, however clearly within a State's acknowledged power, which interferes with or is contrary to federal law, must yield." *Gade v. National Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 108 (1992) (internal citation omitted). Federal courts recognize three types of preemption: (1) express preemption, (2) field preemption, and (3) conflict preemption. *Tarrant Reg'l Water Dist. v. Herrmann*, 656 F.3d 1222, 1241 (10th Cir. 2011).

79. Congress expressly preempted state regulation of commodity derivatives transactions by vesting the Commission with "exclusive jurisdiction" over all "accounts, agreements …, and transactions involving swaps or contracts of sale of a commodity for future delivery … traded or executed on a [DCM]." 7 U.S.C. § 2(a)(1)(A). *See also KalshiEX, LLC v. Assad*, No. 25-7516, __ F.4th ___, 2026 WL 2543846, at *7 (9th Cir. Aug. 28, 2026) (quoting 7 U.S.C. § 2(a)(1)(A)) ("To start, the CEA expressly preempts state laws regulating swaps 'traded or executed on' a DCM."). Congress therefore preempted state regulation of transactions subject to the Commission's "exclusive jurisdiction," including swaps. The event contracts targeted by Arkansas are "swaps," and thus, the Commission's exclusive jurisdiction precludes the State from regulating or prohibiting them.

80. Even without the express language of the CEA preempting state regulation, any state interference with transactions executed on a DCM is preempted because Congress occupied the field of commodity regulation "so comprehensively that it has left no room for supplementary state legislation." *Flaherty*, 172 F.4th at 228–29 (citation omitted). As the scope of the CEA and the long history of amendments to it make clear, Congress created "a comprehensive regulatory structure to oversee the volatile and esoteric futures trading complex." *Merrill Lynch, Pierce,*

*Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 356 (1982). And it vested "exclusive jurisdiction" to administer that structure—particularly in regard to swaps traded on DCMs—with the Commission. 7 U.S.C. § 2(a)(1)(A). "Congress's intent was to provide the CFTC with exclusive jurisdiction to regulate commodities" and "[s]uch exclusive jurisdiction precludes states from exercising supplementary regulatory authority over commodity transactions." *Stuber v. Hill*, 170 F. Supp. 2d 1146, 1151 (D. Kan. 2001). States therefore cannot prohibit, regulate, or otherwise undermine the offering of event contracts on DCMs. *See, e.g., Raoul*, 2026 WL 2969682, at *16 ("[T]he [state gambling] regulations are likely [conflict] preempted if they control a designated contract market's sale of 'swaps.' ").

81. There are also numerous direct conflicts between federal law and Arkansas law. CFTC regulations require DCMs to provide "impartial access" to all eligible participants nationwide. 17 C.F.R. § 38.151(b). On November 5, 2026, the Commission issued an interpretation of this requirement and announced that "DCMs must cease domestic geographic restrictions that violate the Impartial Access Requirements within 30 days, or else submit to the Division of Market Oversight [] an explanation for why such compliance is not feasible." CFTC, Release No. 9323-26, *CFTC Issues Impartial Access Requirements Interpretation* (Nov. 5, 2026), https://www.cftc.gov/PressRoom/PressReleases/9323-26. Arkansas's enforcement efforts would require DCMs to violate that rule by forcing them to deny event contracts to residents of Arkansas.

82. Arkansas law, as applied to swaps traded on DCMs, also "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona v. United States*, 567 U.S. 387, 399 (2012) (internal citation omitted). If States can regulate the offering of event contracts by DCMs, then DCMs would face the prospect of 50 regulators across the country, which defeats Congress's design of centralizing derivatives regulation under the

Commission. So too would Arkansas law conflict with the CEA's self-certification process, which allows DCMs to self-certify to the CFTC that a contract is a swap and gives the Commission alone authority to order DCMs to take down non-compliant contracts. *See* 7 U.S.C. § 7a-2(c)(1), (c)(5)(B); 17 C.F.R. § 40.2(a), (c). That scheme would be undermined if state law could be used to collaterally attack a DCM's self-certifications.

83. Therefore, the CEA preempts Arkansas law to the extent it purports to prohibit, limit, or condition the listing or trading of event contracts on CFTC-regulated DCMs.

## VII. CLAIM FOR RELIEF

### COUNT I – United States Constitution, Art. VI, cl. 2 (Supremacy Clause)

84. The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference.

85. The United States has a cause of action in equity to sue to enjoin a state law's application and enforcement of a law that violates the Supremacy Clause. *See Wyandotte Transp. Co. v. United States*, 389 U.S. 191, 201 (1967) ("Our decisions have established, too, the general rule that the United States may sue to protect its interests."); *United States v. Missouri*, 114 F.4th 980, 986 (8th Cir. 2024) (recognizing the "equitable tradition" of suits by the United States "to enjoin a state law's implementation and enforcement or for other appropriate relief").

86. The event contracts targeted by Arkansas's enforcement action are swaps as defined by the CEA. *See* 7 U.S.C. §1a(47)(A)(i), (ii), (iv). To the extent that the Commission and SEC's proposed rulemaking to further define "swaps" to encompass sports, politics, weather, and culture event contracts becomes final, that would provide an independent basis to classify the event contracts targeted by Arkansas as swaps.

87. The "prediction markets" targeted by Arkansas's enforcement action are designated contract markets that are approved, monitored, and regulated by the Commission.

88. The CEA confers upon the Commission "exclusive jurisdiction" over "accounts, agreements … and transactions involving swaps … traded or executed on a [DCM]." 7 U.S.C. § 2(a)(1)(A). The CEA otherwise creates a comprehensive regulatory structure for overseeing swaps traded on DCMs, which the Commission—and only the Commission—is charged by Congress with administering.

89. Any Arkansas state law—including but not limited to the ADTPA, Ark. Code Ann. §§ 4-88-101 et seq.; Ark. Code Ann. §§ 5-66-101 to -120; Ark. Code Ann. § 7-1-103; 23 CAR § 358-2001 to -2031, and common law—is expressly preempted by the CEA as applied to the trading of event contracts listed on CFTC-regulated DCMs.

90. Any Arkansas state law—including but not limited to the ADTPA, Ark. Code Ann. §§ 4-88-101 et seq.; Ark. Code Ann. §§ 5-66-101 to -120; Ark. Code Ann. § 7-1-103; 23 CAR § 358-2001 to -2031, and common law—is field preempted by the CEA as applied to the trading of event contracts listed on CFTC-regulated DCMs.

91. Any Arkansas state law— including but not limited to the ADTPA, Ark. Code Ann. §§ 4-88-101 *et seq.*; Ark. Code Ann. §§ 5-66-101 to -120; Ark. Code Ann. § 7-1-103; 23 CAR § 358-2001 to -2031, and common law—is conflict preempted by the CEA as applied to the trading of event contracts listed on CFTC-regulated DCMs. Compliance with both state and federal law is impossible, and state law stands as an obstacle to the full accomplishment of Congress's stated objectives and purposes.

## VIII. RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully request the following relief:

A. That this Court enter a judgment declaring that Arkansas state laws violate the Supremacy Clause and are therefore preempted, unconstitutional, and invalid as applied to

transactions listed, offered, or executed on CFTC-regulated DCMs;

B. That this Court issue a preliminary and permanent injunction that prohibits Defendants, as well as their successors, agents, and employees, from investigating CFTC-regulated entities and their affiliates and partners for violations of, or enforcing, Arkansas state law as applied to transactions listed, offered, or executed on CFTC-regulated DCMs;

C. That this Court award Plaintiffs their costs and fees in this action; and

D. That this Court award any other relief it deems just and proper.

Dated: November 10, 2026

Respectfully submitted,

/s/ [signature]
David W. Rubin

*Attorneys for the Commodity Futures Trading Commission*

TYLER S. BADGLEY
General Counsel
M. JORDAN MINOT
Deputy General Counsel
DAVID W. RUBIN
Senior Assistant General Counsel
ANDREW J. WEISBERG
Senior Assistant General Counsel
HENRY J. DICKMAN
Senior Assistant General Counsel

U.S. Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st Street, N.W.
Washington, DC 20581
Tel. (202) 209-1087
tbadgley@cftc.gov
jminot@cftc.gov
drubin@cftc.gov
aweisberg@cftc.gov
hdickman@cftc.gov

*Attorneys for the United States of America*

TIMOTHY J. BORGERSON
Counsel to the Assistant Attorney General
450 5th Street, N.W.
Washington, DC 20001
Tel. 202-860-8970
Timothy.Borgerson@usdoj.gov